**MURPHY OIL CO. v. BURNET, Com'r of Internal Revenue.**

**COMMISSIONER OF INTERNAL REVENUE v. MURPHY OIL CO.**

Nos. 6388, 6459.

Circuit Court of Appeals, Ninth Circuit.

Jan. 11, 1932.

Rehearing Denied Feb. 23, 1932.

Randolph E. Paul, of New York City (Thomas R. Dempsey, A. Calder Mackay, Kenyon F. Lee, and Bradner W. Lee, all of Los Angeles, Cal., of counsel), for petitioner and cross-respondent.

. G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, J. L. Monarch, John G. Remey, and J. P. Jackson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, R. N. McMillan and J. K. Polk, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., of counsel), for respondent and cross-petitioner.

Raymond Benjamin, of Washington, D. C., amicus curiæ.

Before WILBUR and SAWTELLE, Circuit JJ., and JAMES, District J.

WILBUR, Circuit Judge.

Two petitions have been presented to review a determination of the Board of Tax Appeals. That by the commissioner claims that by the order of the board with reference to bonus, payments by the lessee, aggregating $5,173,595.18, were improperly applied by the board in estimating the depletion, properly deductible, from the income for the years 1919 and 1920. That by the taxpayer claims an error in regard to the application of the cost and expense of a law suit and of money paid in settlement of the same, amounting in the aggregate to $1,370,877.24 ($1,200,000 being the amount paid in settlement and $170,877.24 being the cost and expenses of the litigation). This suit involved only the Coyote property belonging to petitioner. The net income of the taxpayer for these years subject to depletion deductions was respectively $2,636,882.78 and $2,988,-550.51.

The facts involved were determined by the Board of Tax Appeals and also appear in part from the computation of tax made by the Commissioner of Internal Revenue by order of the board in pursuance of their rule 50.

This computation of the depletion which is in effect the decision of the board is to be found in the margin.[1] The facts are undisputed.

In 1903 Simon J. Murphy, petitioner's predecessor, obtained an oil lease of 2,240 acres of land owned by Domingo Bastanchury and in 1904 assigned and transferred this lease to petitioner, Murphy Oil Company. An oil well was drilled on the land under this lease, but it was capped. The widow of Domingo Bastanchury, as the administratrix of his estate, later claimed in the litigation involved herein that this well was represented to him to be a dry hole when in fact oil was discovered therein and that he sold the land with that belief. In December, 1904, E. W. Bacon, then secretary of the Murphy Oil Company, purchased the fee in the land from Domingo Bastanchury at $35 an acre, for $78,400, and leased the surface rights to Bastanchury. In January, 1905, Bacon and his wife granted and conveyed the said land to the petitioner, the Murphy Oil Company. Thereafter oil development on the property proceeded and oil was produced in paying quantities. On December 1, 1913, the petitioner leased the land, which was thereafter known as the Coyote project, to the Standard Oil Company of California, together with land thereafter known as the Whittier property. A bonus of $5,173,595.18 was paid for the lease on these two oil properties, which bonus was apportioned by the commissioner to these properties in the sum of $4,517,402.70 and $656,192.48, respectively. Hereinafter only the depletion of the Coyote property as affected by the portion of the bonus allocated to that property will be considered in detail, but the same principles are also applicable to the depletion of the Whittier property.

The Commissioner of Internal Revenue fixed the value of the land, referred to as "Coyote," on March 1, 1913, at $15,710,899.52 and the recoverable oil content of the land on that date at 41,191,605 barrels, and thus fixed the value of the recoverable oil in the ground at 38.141 cents per barrel. The commissioner fixed the value of the land at the time of the execution of the lease to the Standard Oil Company on December 1, 1913, the terms of which are involved in this proceeding, as $15,547,522.17. This value was that fixed for the land on March 1, 1913, less the value of the oil produced therefrom at 38.141 cents per barrel up to December 1, 1913, the date of the lease; that is, less $163,377.35. Under the direction of the Board of Tax Appeals in its decision and in opposition to the views entertained by the commissioner on the subject as determined by the deficiency tax, the commissioner also fixed this amount ($15,547,522.17) as the value of the land in December, 1913, after the execution of the lease and subject to the lease. Thus, upon the execution of the lease, the commissioner, in compliance with the order of the board, raised the value of the recoverable oil belonging to, or payable as royalty to, the petitioner to $1.52564 per barrel; that is, four times $0.38141. This figure was arrived at by subtracting from the total recoverable mineral content of 41,191,605 barrels, less 428,351 barrels already recovered, three-fourths thereof, to wit, 30,572,440 barrels, and leaving as the recoverable portion belonging to the petitioner, as royalty oil, 10,190,814 barrels. The value of this royalty oil was taken as

---

[1]

Petitioner's Exhibit A

Murphy Oil Company
Depletion Schedule

Coyote

| Year | $ Capital Sum Beg. of Year | Added Total | Bbls. Reserves Added Deducted | Total | Free Oil | Bbls. Production Royalty Oil | Total | Unit Cost | $ Depletion Sustained |
|---|---|---|---|---|---|---|---|---|---|
| 3/1/13 to 11/30/13 | | $15,710,899.52 | | 41,191,605 | —— | 428,351 | 428,351 | .38141 | 163,377.35 |
| 12/1/13 to 12/31/13 | 15,547,522.17 | 15,547,522.17 | 30,572,440 | 10,190,814 | —— | 18,432 | 18,432 | 1.52564 | 28,120.60 |
| 1914 | 15,519,401.57 | 15,519,401.57 | | 10,172,382 | 142,829 | 125,256 | 268,085 | 1.52564 | 191,095.56 |
| 1915 | 15,328,306.01 | 15,328,306.01 | | 9,904,297 | 144,836 | 279,379 | 424,215 | 1.54764 | 432,378.12 |
| 1916 | 14,895,927.89 | 14,895,927.89 | | 9,480,082 | 149,719 | 670,213 | 819,932 | 1.57123 | 1,053,092.28 |
| 1917 | 13,842,835.61 | 13,842,835.61 | | 8,660,150 | 167,675 | 1,410,707 | 1,572,382 | 1.59845 | 2,254,944.60 |
| 1918 | 11,587,891.01 | 11,587,891.01 | | 7,087,768 | 167,622 | 1,868,722 | 2,036,344 | 1.63491 | 3,055,192.28 |
| 1919 | 8,532,698.73 | 8,532,698.73 | | 5,051,424 | —— | 1,644,897 | 1,644,897 | 1.68916 | 2,778,494.22 |
| 1920 | 5,754,204.51 | 5,754,204.51 | | 3,406,527 | —— | 1,340,237 | 1,340,237 | 1.68916 | 2,263,874.73 |

equal to the value of the land prior to the execution of the lease, thus giving as the value of each barrel of royalty oil $1.52564. It seems absurd on its face to estimate the value of the royalty oil in the ground at the time of the execution of the lease at 38.141 cents, and immediately thereafter at $1,52564, but the absurdity disappears when it is observed that the $1.52564 represents oil brought to the surface, and that the difference between the 38.141 cents and the $1.52564 represents the cost to the petitioner of bringing the oil to the surface; that is, it cost petitioner three barrels of oil at 38.141 cents to bring a barrel of oil to the surface which was worth 38.141 cents in the ground, and $1.52564 at the surface. "Worth" in this connection meaning capital investment. But the actual depletion of the value of the land as of March 1, 1913, by the recovery of oil therefrom was nevertheless four barrels of oil at 38.141 cents for each barrel of royalty oil recovered for the petitioner. In these statements we are ignoring for the present the added cost of extraction due to the consumption of oil by the lessee in its work of development and production which was known as "free oil." In considering the reasonableness of this figure of $1.52564 as representing the portion of petitioner's capital investment in the oil recovered as royalty to be deducted from the total receipts actually derived from the royalty oil in determining the proportion thereof which was petitioner's income and assuming, as the commissioner and the Board of Tax Appeals held, that the market value of the property on November 30, 1913, was $15,-547,522.17, it should be observed that the owner of the land had several methods of reducing its capital to money. This it could do by selling the property for its market value, which was the same as March 1, 1913, less depletion, in which event the purchase price would not be subject to income tax because it would merely represent a change in form of capital, or it could continue the operations it was already engaged in for the bringing of the oil to the surface. Instead of doing either, it could enter into a lease or contract with a third party by which the third party undertook to bring the oil to the surface and sell it or turn it over to the petitioner. This would reduce the amount of oil which the owner would be entitled to sell at market prices, but, depending upon the market price of oil, might or might not increase his income. The effect of the lease as determined by the Board of Tax Appeals (ignoring the question of bonus for the moment) was that the owner paid from the oil content of the soil 30,572,-

440 barrels of oil, plus the free oil allowed to the tenant under the lease, as the expense of bringing to the surface the remaining recoverable oil it was to receive. Under these circumstances it no doubt would be a reasonable adjustment of the relationship of the landlord and tenant with reference to depletion to fix $1.52564 as the capital investment on March 1, 1913, in each barrel of royalty oil brought to the surface and to allow this whole amount to the landlord as his depletion, the tenant having no capital investment at this time (March 1, 1913), and on this hypothesis it would be entitled to no depletion allowance.

We are here met with the difficulty in the case arising from the payment of a bonus of $4,517,402.70 which was determined by the commissioner in one way and by the Board of Tax Appeals in the other. The lessee agreed to pay this money in installments extending over a period of five years aggregating $4,-517,402.70, regardless of whether or not any oil was produced from the property during that period. This amount the Board of Tax Appeals determined to be income to the landlord taxable as such during the years in which it was paid, but the commissioner had determined the entire bonus to be a return of capital investment to the landlord (with certain minor deductions hereinafter referred to) ; that is to say, the commissioner in effect held that the petitioner did not pay 30,572,440 barrels of oil in the ground valued at 38.141 cents per barrel to the lessee for bringing petitioner's royalty oil to the surface (that is, $11,660,634.34 worth of oil for that purpose), but paid that amount less the bonus of $4,-517,402.70, to wit, $7,143,231.64. By this process of reasoning the commissioner came to the conclusion that the amount of petitioner's capital invested in its royalty oil in the ground was about $1.08236 per barrel. Consequently, the point involved here resolves itself into the question whether or not $1.-52564 or $1.08236 should be deducted from the selling price of each barrel of royalty oil recovered during the years 1919 and 1920, as the petitioner's capital investment therein of March 1, 1913.

The determination by the Board of Tax Appeals as to the depletion of the property due to the production of oil is predicated upon the proposition that when the petitioner shifted his position from that of owner to that of landlord the value of his interest remained exactly the same, notwithstanding that he had received $4,517,402.70 in cash from his investment as of March 1, 1913. Now, it is obvious that if the land in fee was worth $15,-

547,522.17 immediately before the lease and that if the lease was a reasonable one to be made at the time, that is, so reasonable that it did not depreciate the value of the capital investment of the landlord in the land, he could have sold the land subject to the lease for exactly the same sum for which he could have sold the land without the lease, namely, $15,547,522.17, but a sale under these circumstances would of course give to the purchaser the right to the bonus payments of $4,517,-402.70. If the landlord insisted upon reserving to himself these bonus payments, it is obvious that under the circumstances he could not hope to get more for the land subject to the lease than the $11,030,119.47 cash, which represented his capital investment in the recoverable royalty oil. It would seem then that the interest of the landlord in the royalty oil at the surface would be his proportion of the recoverable content of 10,190,814 barrels at a price to equal $11,030,119.47, which would be $1.08236 per barrel.

Thus far we have discussed on principle rather than on authority the depletion allowance to the landlord upon the relative bases adopted by the Board of Tax Appeals and the commissioner, as to the capital investment of the landlord in each barrel of recoverable royalty oil, which leads us to the conclusion that the commissioner was right and the Board of Tax Appeals was wrong; but there is an entirely different line of approach to the subject, which leads more definitely and more authoritatively to the same conclusion, in the light of legislation, regulations, and decisions on the subject heretofore rendered. We will now consider the subject from that angle. The subject under consideration has been of sufficient importance to invoke the action of Congress in its revenue laws and has been the subject of rules and regulations adopted by the commissioner and is involved in many judicial decisions. Originally the method of fixing the depletion allowance for oil properties under the revenue law of 1913 was a fixed percentage of the value of the oil recovered, to wit, 5 per cent. Subdivision G (b), § 2, Tariff Act of 1913, 38 Stat. 114, 166. In 1918 the Revenue Law was passed which was in force at the time of the taxable years 1919 and 1920, now under consideration. That law applicable to depletion is as follows:

"Sec. 214 (a) That in computing net income there shall be allowed as deductions: * * *

"(10) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance **for depletion and** for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: Provided, That in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date: Provided further, That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter; such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee. * * *"

Revenue Act of 1918, c. 18, 40 Stat. 1057. See, also, section 234 (a) (9), Id.

It is to be observed that the statute quoted provides for a reasonable allowance for depletion of the oil content of oil land "based upon cost including cost of development not otherwise deducted." Now the cost of the land in the case at bar was $78,400. The cost of development is not shown by the record, but Congress further provided, in regard to lands situated as the land in the case at bar, "that in the case of such properties acquired prior to March 1, 1913, the fair market value of the property (or the taxpayer's interest therein) on that date shall be taken in lieu of cost up to that date." So that in effect, as applicable to the case at bar, the law requires that the depletion allowance shall be "based upon the fair market value of the property on March 1, 1913 ($15,710,899.-50) and the cost of development not otherwise deducted." The statute further provides: "Such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary. *In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.*" (Italics ours.)

The Supreme Court has had occasion to consider the right to a depletion allowance of a lessee upon a royalty basis of two tracts of mining land situate in Minnesota. Lynch

v. Alworth-Stephens Co., 267 U. S. 364, 45 S. Ct. 274, 69 L. Ed. 660. This lessee, in the case cited, who was to pay a royalty of 30 cents a ton for iron ore produced, had sublet one of the tracts upon a royalty basis of 75 cents a ton and the other 60 cents a ton. He was thus in the dual position of lessee and lessor. The Supreme Court held that he had a property right in the property and an interest therein (a "depletable base," to use the terminology of the briefs) within the meaning of the revenue laws of the United States. Section 12 (a), Revenue Act of 1916, 39 Stat. 756, 767. In that regard, Justice Sutherland, speaking for the court, said:

"It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits (U. S. v. Biwabik Mining Co., 247 U. S. 116, 123, 38 S. Ct. 462, 62 L. Ed. 1017); but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. See Hyatt v. Vincennes Bank, 113 U. S. 408, 416, 5 S. Ct. 573, 28 L. Ed. 1009; Ewert v. Robinson [C. C. A.] 289 F. 740, 746-750. And there can be no doubt that such an interest is property. Hamilton v. Rathbone, 175 U. S. 414, 421, 20 S. Ct. 155, 44 L. Ed. 219; Bryan v. Kennett, 113 U. S. 179, 192, 5 S. Ct. 407, 28 L. Ed. 908. * * *

"We agree with the Circuit Court of Appeals (294 F. 194) that: 'The plain, clear, and reasonable meaning of the statute seems to be that the reasonable allowance for depletion in case of a mine is to be made to every one whose property right and interest therein has been depleted by the extraction and disposition "of the product thereof which has been mined and sold during the year for which the return and computation are made." And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.'

"It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other; and the extent of it, with *the consequent deduction to be made, in each case is to be arrived at in the same way, namely, by determining the aggregate amount of the depletion of the mines in which the several interests inhere, based upon the market value of the product, and allocating that amount in proportion to the interest of each severally considered.*" Pages 369, 370 of 267 U. S., 45 S. Ct. 274, 275, 69 L. Ed. 660. (Italics ours.)

According to this very clear exposition of the Revenue Act of 1916 (39 Stat. 756, §§ 2, 10, 12 (a), which is unambiguous, the lessee as well as the lessor of the oil properties was entitled to a depletion allowance. The regulations of the Treasury Department (Reg. Art. 170) under the Revenue Act of 1916 provided for the method of ascertaining and apportioning the allowance for depletion of oil property to the lessor and lessees of such property where a bonus has been paid substantially as was done by the commissioner in the case at bar under the Revenue Act of 1918.

The Revenue Act of 1918, on the subject hereinabove quoted, allowed larger discretion to the Commissioner of Internal Revenue in ascertaining the annual depletion to be allowed, but expressly required that the depletion allowance should be "equitably apportioned between the lessor and lessee." Section 214 (a) (10), above quoted. The allowance of the total depletion to the lessor, as was required by the decision of the Board of Tax Appeals, left nothing to be apportioned to the interest of the lessee in the property. It can hardly be doubted that from the standpoint of the lessee the bonus payments represented invested capital and it is so provided by Treasury Regulations 45, Article 215 (hereinafter quoted in full), wherein it is provided that, "The bonus or other sum paid by the lessee for a lease made on or after March 1, 1913, will be his value for depletion as of date of acquisition." As the total value of the oil in the ground in the Coyote property was $15,547,522.17, it is obvious that the lessee, by the payment of the bonus of $4,517,402.70, had an interest in each of the 40,763,254 barrels of oil in the ground of about one-third the value thereof,

or, to be accurate, 11.083 cents, and that the lessee's capital investment is decreased to that extent by each barrel of oil brought to the surface. It would follow as an ancillary proposition that the capital investment or at any rate the depletion allowance of the lessor in each barrel of oil in the ground, as of the date of the lease, would be accordingly decreased; that is, would be 27.058 cents. That is to say, for the purpose of determining depletion and apportioning the amount thereof between the lessor and the lessee under the statute and the rules and regulations of the Treasury Department, the lessee has a depletion interest in each barrel of oil produced of 11.083 cents which cannot properly be allowed to the lessor. The Supreme Court has repeatedly passed upon this principle.

The Supreme Court, in Burnet v. Thompson Oil & Gas Co., 283 U. S. 301, 51 S. Ct. 418, 75 L. Ed. 1049, had occasion to consider the depletion allowance for oil properties acquired before March 1, 1913, under the Revenue Act of 1918. The taxpayer was contending for a depletion allowance which should make up for inadequate depreciation allowances in previous years under former revenue acts upon the theory that the taxpayer was entitled during the life of his lease to recover by way of depletion the full amount of his capital investment. That is to say, the taxpayer was contending for depletion allowance for the taxable years during the remainder of the term, which would cover the actual depletion between March 1, 1913, and December 31, 1915, $91,686.15, whereas he had been actually allowed during that period under the revenue laws only $6,322.02. It was conceded that the entire question was one of statutory construction. The Commissioner of Internal Revenue, acting under the regulations of the department, had determined the depletion suffered during the taxable year by estimating the invested capital at the beginning of the year as of the value of March 1, 1913, less the actual depletion theretofore sustained; that is, less the $91,686.15 above referred to. The commissioner had limited the depletion allowance for the taxable year to the actual depletion sustained during the taxable year, in accordance with the decision in Lynch v. Alworth-Stephens Co., supra, construing the Revenue Act of 1916. The Supreme Court sustained the ruling of the commissioner, thus holding that the action of the commissioner limiting the depletion allowance to the actual depletion during the taxable year was a proper interpretation of the Revenue Act of 1918, as well as that of 1916. The court stated (page 306 of 283 U.

S., 51 S. Ct. 418, 420, 75 L. Ed. 1049) : "The nature of the tax as one for annual periods has been repeatedly mentioned in dealing with its application in various situations. The taxable year 1918, and that only, is involved, and deductions applicable to that year only should be allowed."

In the case at bar we are therefore dealing with the depletion allowance for the years 1919 and 1920 only, and the allowance is limited to the actual depletion during those years, under the Revenue Act of 1918, as was also the case under the Revenue Act of 1916, which was 6,579,588 barrels and 5,360,948, respectively.

We turn now from the consideration of the statute and of the decisions of the Supreme Court to the rules and regulations of the Treasury Department. The commissioner adopted regulations in pursuance of the statute (No. 45, Art. 215) as follows: "Art. 215. Depletion—Adjustments of accounts on bonus or advanced royalty.—(a) Where a lessor receives a bonus or other sum in addition to royalties, such bonus or other sum shall be regarded as a return of capital to the lessor, but only to the extent of the capital remaining to be recovered through depletion by the lessor at the date of lease. If the bonus exceeds the capital remaining to be recovered, the excess and all the royalties thereafter received will be income and not depletable. If the bonus is less than the capital remaining to be recovered by the lessor through depletion, the difference may be recovered through depletion deductions based on the royalties thereafter received. The bonus or other sum paid by the lessee for a lease made on or after March 1, 1913, will be his value for depletion as of date of acquisition."

This regulation was amended by Article 216, Regulations 69, to read as follows: "Art. 216 (215). Depletion—Adjustments of accounts based on bonus or advanced royalty.— (a) Where a lessor receives a bonus in addition to royalties, there shall be allowed as a depletion deduction in respect of the bonus an amount equal to that proportion of the cost or value of the property on the basic date which the amount of the bonus bears to the sum of the bonus and the royalties expected to be received. Such allowance shall be deducted from the amount remaining to be recovered by the lessor through depletion, and the remainder is recoverable through depletion deductions on the basis of royalties thereafter received."

Under this rule for the allowance of de-

pletion to the lessor as result of bonus payments and expressing the anticipated net market price of oil as X, the amount would be expressed by the formula:

form of oil resources of reserves into marketable products or the equivalent received for such product. Under such principle the depletion allowance for the year or years of the

$$\text{Depletion deduction to lessor} = (X \times 10,190,814) + (\$5,517,402.70) \quad \frac{\$4,517,402.70 \text{ of } \$15,547,522.17}{}$$

It will be observed that the effect of this method of deducting a bonus is to put the bonus on a par with the actual receipts from the sale of oil by assuming that the bonus contains the same element of profit or income to the landlord that would be derived from the sale of oil recovered as royalty.

The Board of Tax Appeals held that the bonus was not return of capital in whole or in part, but was income, and that to consider such bonus in fixing depletion allowance was a departure from the depletion concept, and therefore the regulation of the commissioner, which treated the bonus as a partial return of capital, was void because in conflict with the statute in relation to taxable gains. In order to make the proposition involved more clear, we quote as follows from the opinion of the Board of Tax Appeals:

"The respondent confesses error to the extent that he failed to follow the regulation. It remains for us to test the validity of the rule therein promulgated. In Nelson Land & Oil Co., 3 B. T. A. 315, we made it clear that, in our opinion, such a bonus received by a lessor was not a return of capital but is an advance rental or royalty and is taxable as income. That case was followed in R. H. Hazlett, 10 B. T. A. 332, and we are not cited and have been unable to find any authority to the contrary. See, also, Henry L. Berg, 6 B. T. A. 1287; John T. Burkett, 7 B. T. A. 560; D. R. McDonald, 7 B. T. A. 1078; and R. H. Hazlett, supra, in which he held that such bonuses were not gains derived from the sale of 'capital assets' under the capital gain provisions of the 1921 Act.

"The bonus payment in the instant case was a part of the consideration paid for the lease. While expected production undoubtedly was considered in fixing the amount of the bonus, it is elementary under the laws governing such agreements that its payment did not, in any wise, depend upon, or relate to, production. The lessee's liability therefor was fixed by the terms of the contract. On the other hand, the operation of the principle of depletion depends upon exhaustion of resources through production—i. e., the recovery of capital through its conversion from the

bonus payments can only be measured by reference to the oil produced. If, as we have pointed out, the bonus is income, no part of which represents recovery of capital, it follows that any depletion allowance against such income is a departure from the depletion concept. The regulation relied on by the respondent is clearly such a departure. While it might, in some cases at least, produce a more equitable result, the statutory allowance may not be so varied by administrative regulation."

Murphy Oil Co. v. Commissioner of Internal Revenue, 15 B. T. A. 1195, 1202.

For the same reason we also quote the decision of the board in Nelson Land & Oil Co., 3 B. T. A. 315, cited in the foregoing excerpt from the opinion of the board: "Why a 'bonus or other sum in addition to royalties' forming a part of the consideration for the lease should be regarded as a return of capital any more than the royalties is beyond our comprehension. It would be just as logical to hold that the royalties, to the extent of the capital remaining to be recovered by the lessor, constitute a return of capital. The method prescribed by the statute of returning to a corporate taxpayer its capital investment, free from taxation, is through the depletion allowance provided for by section 234 (a) (9) of the Revenue Acts of 1918 and 1921. A bonus paid under such circumstances is as much a part of the consideration as the royalties. It is in fact and in substance a part of the royalties." (Pages 325, 326, of 3 B. T. A.)

The board in that case quoted from the decision of the Supreme Court in Work v. United States ex rel. Mosier, 261 U. S. 352, 43 S. Ct. 389, 391, 67 L. Ed. 693, with reference to a bonus paid for an oil and gas lease upon lands belonging to members of the Osage Tribe, as follows: "It was in effect a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down payment. We do not see how it can be classified as anything else. It was income from the use of the mineral resources of the land. Of course, it involved a consumption and reduction of

the mineral value of the land, but so does a royalty. This is an inevitable characteristic of income from the product of the mine."

The position of the board in this case is to the effect that the bonus does not come within the provisions of the statute in reference to capital gain and that it must therefore be treated as income notwithstanding the provisions of the statute and of the regulations regarding depletion allowances. It will also be observed that the board classified bonus as identical with royalty oil and that neither could justly be regarded as return of capital, while the whole theory of the depletion allowance is that the proceeds derived from the sale of royalty oil is of necessity in part a return of capital. It is the only manner in which the capital represented by the oil will be returned to the lessor, and for that reason is subject to a depletion allowance. The depletion allowance under the ruling of the commissioner in this case was made to the taxpayer upon the theory that although its royalty amounted to over two million dollars a large portion of that royalty constituted a return of capital which was allowed to it under the statute to compensate for the depletion of its oil reserve. The question in this case is the amount per barrel to be allowed to the petitioner as its returned capital and this must be determined by ascertaining, as the law provides, the fair market value of the property on March 1, 1913, and by allowing a reasonable allowance for depletion based in part upon that property value. The theory upon which the commissioner has proceeded in fixing petitioner's tax under the regulations of the Treasury Department is that the taxpayer is entitled to the return of his entire capital in the form of bonuses and royalties, and that his liability for tax upon the income is upon the balance of the income derived from the property after deducting the installment of capital included in the royalty oil. The regulation is not only not in conflict with the statute, but directly conforms thereto. The statute with reference to depletion of oil properties is a special one with reference to the particular subject of oil leases involving the production of oil and minerals from mines, and the consequent return of capital by the owners of interests therein, and controls over other general provisions of the law in regard to the return of capital investments.

We hold that the commissioner correctly determined that at least a part, if not all, of the bonus payment is to be treated as return of capital. The burden is on the taxpayer to show that the computation of tax by the commissioner is erroneous, and there is a failure of proof in this case sufficient to permit allocating a part of the bonus payment to return of capital and part to income, under the above quoted regulation (Reg. 45, Art. 215, as amended). An essential element of proof in order that a tax might be determined in accordance with the regulations of the Treasury Department was proof of the probable market value of the oil to be marketed under the lease in terms of dollars per barrel, and this data not having been furnished by the taxpayer it failed to prove that it is entitled to have any part of the bonus treated as income rather than a return of capital. Thus, upon the record in this case, either all of the bonus payment is to be treated as a return of capital, or none of it is, and the appeal has been so presented by the petitioner. The commissioner must therefore be sustained in his estimate of the tax.

In view of our conclusion with regard to the relation of the bonus to the depletion allowance, it will be necessary to consider the petition of the taxpayer to review action of the board on the ground that it erred in treating the payment in settlement of litigation and the expense thereof as a capital expenditure.

The administratrix of the estate of Domingo Bastanchury, Maria Bastanchury, brought a suit to recover from petitioner the 2,240 acres of land sold by her husband to the petitioner's vendor, offering to restore the purchase price of $78,400, upon the ground that the property was obtained by fraudulent concealment of the fact that the oil well sunk by petitioner's vendor was successful and that the decedent therefore sold the land for an inadequate consideration because of such concealment. In order to toll the statute of limitations, it was alleged that the fraud was discovered within the statutory period. The substance of the allegation from the standpoint now under consideration was that the petitioner's predecessor had acquired the title to the property without paying an adequate consideration for it, which it in equity still owed. The remedy invoked was that of rescission and as an incident to rescission a recovery of the proceeds derived from the sale of oil extracted therefrom.

The defrauded vendor had the right thus to rescind, if the allegations were true, or to confirm the sale and sue for damages for the fraud. This damage would no doubt be measured by the difference in the value of the thing sold, as it was believed by the vendor, and its actual value. See Hines v. Brode, 168 Cal. 507, 143 P. 729. While the suit was

one to rescind, the settlement thereof for a money consideration necessarily involved a confirmation of the sale and a payment of damages for the fraud in an amount fixed by agreement instead of by decree of court by way of compensation for the land. While the difference between the value received by the vendor and the value of the land at the time of the transaction, judging from its appraised value in the case at bar, must have been much more than the amount received in settlement, it does not alter the fact that the payment made to the vendor was substantially a deferred payment for the property. It was therefore essentially a capital investment and not allowable as a deduction from income. Moreover, in fixing the tax of the petitioner it already had been given the benefit of the full market value of the property as of March 1, 1913, upon the theory that it owned the property at that time. The $1,200,000 therefore was not only not a proper deduction from the income because it was a capital expenditure, but it should not be added to the capital in determining the depletable base, for that had already been fixed by the statute as a fair market value of the property on March 1, 1913, and this estimated value included the entire property, including, of course, the interest therein which was still owned by Domingo Bastanchury and which was in effect subsequently acquired by petitioner by the payment of the additional purchase money. If the money paid in settlement of the litigation is not a proper addition to capital investment, neither is the $32,-151.77 expended in 1918, nor the $170,877.24 expended in 1919 as attorneys' fees and costs of the litigation. We therefore agree with the conclusion of the Board of Tax Appeals in 15 B. T. A. 1195, 1201, on this subject, which was as follows:

"To the extent that the expenses and payment were incurred and made in defense of the claim against the oil properties they were capital expenditures. We have repeatedly held that the cost of defending title, whether in the form of legal fees or compromise payments, is a capital expenditure representing additional cost of the property. Lincoln L. McCandless, 5 B. T. A. 1114; Gopher Granite Co., 5 B. T. A. 1216; Seletha O. Thompson, 9 B. T. A. 1342; Frederick McLean Bugher [9 B. T. A. 1155], supra; North American Oil Consolidated, 12 B. T. A. 68; Phoenix Development Co., 13 B. T. A. 414. The decisions in Kornhauser v. U. S. [276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505], supra, and the Superheater Co., 12 B. T. A. 5, which are relied upon by the petitioner, are not in conflict with these cases. In the Superheater Case the contemplated litigation grew out of an action of the board of directors, acting as such. The claim settled did not involve title. In the Kornhauser Case the legal expenses were incurred to contest a claim against income received, differing fundamentally from the ordinary attack on title, even though the income in question consisted of shares of stock.

"In view of such conclusion we must reject petitioner's contention that the total deductions claimed should be allowed. We can not allow the total and it would be idle for us to further consider whether any part of such total (i. e., that portion allocable to the defense and settlement of the claim for accounting) is allowable as the record furnishes no basis for the apportionment of the whole among the several claims defended or settled.

"The petitioner's contention that if the litigation and settlement costs are not deductible they must represent capital expenditures to be added to the amortizable capital value must likewise be rejected."

We refrain, however, from determining whether or not a portion of the amount paid in settlement and a portion of the attorneys' fees in the action were to be properly apportioned to the defense of the title, and another portion to the defense of the claim to recover proceeds derived from the land. As stated by the Board of Tax Appeals, there is no basis for making such allocation, even assuming that such an allocation could or should be made, if there were sufficient evidence upon which to base it. We therefore express no opinion upon the propriety of such allocation, although, as we have indicated, we are inclined to the view that none should be made.

The order of the Board of Tax Appeals is reversed as to bonus deductions and affirmed as to attorneys' fees, costs, and settlement, and the determination of the commissioner is affirmed.