### AMBASSADOR PETROLEUM CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7478.

Circuit Court of Appeals, Ninth Circuit.

Feb. 5, 1936.

WILBUR, Circuit Judge, dissenting.

———◆———

George Bouchard, Latham, Watkins & Bouchard, Joseph D. Brady, and Rollin E. Ecke, all of Los Angeles, Cal., for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and James W. Morris, John H. Jackson, and Ellis N. Slack, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

GARRECHT, Circuit Judge.

In the present petition to review there are involved income taxes for the calendar year 1925 amounting to $5,972.35, as redetermined in a decision of the Board of Tax Appeals. See 28 B.T.A. 868.

The entire deficiency redetermined by the Board was $6,734.98. In his assignments of error, however, the petitioner asserts that the Board "erred in finding that there was any deficiency for the taxable year in excess of $762.63." This leaves $5,972.35 as the amount in controversy.

In arriving at the deficiency involved herein, the respondent determined that the "gross income from the property" was $416,630.80, and that the "net income of the taxpayer (computed without allowance for depletion) from the property" was $147,490.82. The respondent allowed a deduction for depletion amounting to $73,745.41.

Section 204 (c) (2) of the Revenue Act of 1926 (44 Stat. 14) reads as follows:

"(c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that— * * *

"(2) In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

Applying the foregoing provision, the petitioner contends that the correct depletion allowance is $114,573.47, or 27½ per cent. of $416,630.80, the "gross income from the property." The respondent, how-

ever, invokes the other provision of the same paragraph; namely, that the depletion allowance should not exceed 50 per cent. of the net income from the property. The respondent computes the net income from the property as being $147,490.82, and 50 per cent. of that sum is $73,745.41, the amount of depletion allowed by him.

The respondent has determined "the net income of the taxpayer * * * from the property" in the following manner:

In addition to deducting from $416,630.80, which was the "gross income from the property," the sum of $177,256.70, representing the aggregate of "operating expenses," the respondent also deducted from such gross income the sum of $91,883.28, representing "development expenses." It is this latter deduction to which the petitioner excepts.

The two deductions just noted total $269,139.98, leaving the sum of $147,490.-82 as the "net income of the taxpayer (computed without allowance for depletion) from the property." If the "development expenses" had not been deducted from "gross income from the property," the net income from the property would have been $239,374.10, and the maximum limit for the depletion allowance would have been raised to 50 per cent. of that sum, or $119,687.05, instead of the sum of $73,745.41 allowed by the respondent. The depletion allowance of $114,573.47, claimed by the petitioner, would thus have been well within the limit set by the statute.

The question presented therefore resolves itself into whether or not in determining the amount of depletion allowable under section 204 (c) (2) of the Revenue Act of 1926, development expense should be deducted from "gross income from the property" in arriving at "the net income * * * from the property" for the purpose of applying the 50 per cent. limitation provided therein. In other words, it is necessary to ascertain the meaning of the phrase "net income * * * from the property."

An examination of the administrative and legislative history of the Revenue Act of 1926 and its immediate predecessors will be of assistance in this inquiry.

Section 234 (a) (9) of the Revenue Act of 1921 (42 Stat. 254) reads in part as follows:

"Sec. 234 (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted: * * * Provided further, That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter: And provided further, That such depletion allowance based on discovery value shall not exceed the net income, computed without allowance for depletion, from the property upon which the discovery is made, except where such net income so computed is less than the depletion allowance based on cost or fair market value as of March 1, 1913; such reasonable allowance in all the above cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary."

Interpreting section 234 (a) (9) of the act of 1921, the Treasury Department's Regulations 62 contain the following provision:

"Art. 201 (h). *Depletion allowance in case of discovery:* The deduction for depletion in case of a discovery can not exceed the net income computed without allowance for depletion, from the property upon which the discovery is made, except where and to the extent that such net income so computed is less than the depletion allowance based on cost or fair market value as of March 1, 1913. Net income is the gross income from the sale of all mineral products and any other income incidental to the operation of the property for the production of the mineral products, less operating expenses, including depreciation on equipment, and taxes, but excluding any allowance for depletion. * * *"

It is observable that the foregoing definition of "net income" from the property

calls for the deduction of "operating expenses" from the gross income realized from the property, but does not require the deduction of "development expense" therefrom.

On the subject of depletion allowance, the Revenue Act of 1924 contained an important change from the act of 1921. Section 204 (c) of the 1924 statute (43 Stat. 258) read as follows:

"The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that in the case of mines, oil and gas wells, discovered by the taxpayer after February 28, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter; but such depletion allowance based on discovery value shall not exceed 50 per centum of the net income (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance be less than it would be if computed without reference to discovery value."

Article 201 (h) of Regulation 65 under the Revenue Act of 1924 defined "net income (computed without allowance for depletion)" from the property precisely as it had been defined in Regulations 62; namely, as being "the gross income from the sale of all mineral products and any other income incidental to the operation of the property for the production of the mineral products, less operating expenses, including depreciation on equipment and taxes, but excluding any allowance for depletion."

The legislative history of the Revenue Act of 1924 indicates that the term "net income (computed without allowance for depletion) from the property" is synonymous with "operating·profit." In a "Statement of the Changes Made in the Revenue Act of 1921 by the Treasury Draft [of the 1924 Act] and the Reasons Therefor," A. W. Gregg, special assistant to the Secretary of the Treasury, and afterward general counsel of the Bureau of Internal Revenue, said:

"Sec. 204. Paragraph (2) of subdivision (b) supersedes the second and third provisos of section[s] 214 (a) (10) and 234 (a) (9) of the existing law. The existing law limits discovery depletion to the *operating profit* from the property upon which the discovery is made. The proposed draft limits discovery depletion to 50 per cent of the *operating profit* [from the property] upon which the discovery has been made. Experience in administering the law has shown that the limitation imposed by the existing law is not a sufficient limitation, and it has been considered that 50 per cent of the operating profit from the property represents a fair limitation upon discovery depletion." (Italics our own.)

The Gregg Statement appears as Appendix D to Klein's Federal Income Taxation, at page 308 of the 1929 Edition, with the following explanatory note:

"The value of the statement lies in the fact that not only does it give reasons for the suggested changes, but that it presents clearly the views of one of the best informed men in the country as to the Treasury Department's interpretation of many difficult points in the 1921 and earlier Acts. It must be stated, however, that Mr. Gregg assumed personal responsibility for the views which he expressed, and emphasized the fact that the statement did not represent an official point of view. Nevertheless, the explanations contained in the statement with respect to the effect and purpose of the suggested changes, most of which were adopted eventually by Congress, are regarded by practitioners as at least quasi-official indications of what Congress intended to enact. Inasmuch as many of the provisions of the 1924 Act, especially the basis and reorganization sections, have been continued in the later Acts, it is highly desirable that the statement referred to be made readily available to practitioners. For that reason it has been presented here.

"A recent decision of the Circuit Court of Appeals, Third Circuit (28 F.(2d) 30— August 3, 1928 [certiorari dismissed, 278 U.S. 664, 49 S.Ct. 178, 73 L.Ed. 570]), in the case of U. S. v. Whyel, refers to Mr. Gregg's statement. The reference to the statement, which was immediately followed by the Court's observation that 're-

ports of committees of the House and Senate are regarded as expository [expositive] of the legislative intent in a case where the meaning of a statute is obscure', *leads to the conclusion that the Court took cognizance of the fact that Mr. Gregg's views had been adopted by Congress."* (Italics our own.)

A similar use of the term "operating profit from the property" as synonymous with "net income * * * from the property" is found in the report of the Senate Finance Committee, Senate, 68th Congress, First Session, Report No. 398, p. 20, referred to in Cong. R., vol. 65, part 6, page 6179.

Indeed, the Commissioner's own regulations would indicate that he has repeatedly construed "operating profit" as equivalent to "net income from the property." In article 201 (f) of Regulations 62, we find the following:

"'Operating profit' is the net income from mineral production before depletion and depreciation are deducted. It is distinct from net income."

Similar language is used in the corresponding sections of Regulations 65 and 69, the latter being promulgated under the Revenue Act of 1926, which is the statute applicable to the instant case.

It seems scarcely reasonable to suppose that, in the absence of a specific provision therefor, "development expense" should be deducted in determining "operating profit," which, as the term indicates, denotes "profit" or "income" from simply the "operation" of the well, without reference to initial outlay. In fact, the respondent concedes that "prior to September 26, 1927, it had been the practice of the Commissioner to disregard development expenses in computing the 'net income from the property.'"

We turn now to the statute specifically applicable to the present controversy—the Revenue Act of 1926.

In the 1926 act, the words "the net income of the taxpayer (computed without allowance for depletion) from the property" were employed to designate the yardstick by which the depletion allowance should be measured. Almost identically the same language had been used in the same connection in the Revenue Acts of 1921 and 1924. In the 1921 act, however, the limitation of the depletion allowance was 100 per cent. of such income, while in the 1924 and 1926 statutes the limitation was 50 per cent.

It should be borne in mind that when Congress used the term in the 1924 act, it had before it the Report of the Senate Committee on Finance and Gregg's Statement, supra, in which the expression "operating profit" was used synonymously with "the net income, computed without allowance for depletion, from the property." Congress also had before it the Treasury Regulation, supra, defining "operating profit" as "the net income from mineral production before depletion and depreciation are deducted," and carefully distinguishing "operating profit" from "net income" in general, from which latter a deduction for "development expense" would be proper.

When Congress used the expression "the net income of the taxpayer (computed without allowance for depletion) from the property," in the Revenue Act of 1926, it had, in addition to all the foregoing regulations and reports, another Treasury Regulation reiterating that "operating profit" is the net amount received from mineral production, etc., and again distinguishing such net "amount" or income from ordinary net income.

It can therefore be seen that the administrative and legislative history of the 1926 statute establishes that "net income * * * from the property" and "operating profit" are synonymous. There is nothing in the Revenue Acts to suggest that "development expense" should be deducted from gross income in order to arrive at "operating profit"; nor does reason point to any such formula.

In addition to section 204 (c) (2), supra, the Revenue Act of 1926 (44 Stat. 41) contains the following pertinent provision:

"Sec. 234 (a) In computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(8) In the cases of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary."

As will be seen from the text of section 204 (c) (2) of the 1926 act, supra, oil

depletion based upon discovery value was abandoned, since such allowance "was found difficult of administration." Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 318, 55 S.Ct. 174, 177, 79 L.Ed. 383; U. S. v. Dakota-Montana Oil Co., 288 U. S. 459, 466, 53 S.Ct. 435, 77 L.Ed. 893.

The respondent relies upon certain sections of article 201 of Regulations 69 as authorizing the deduction of development expenses from gross income in determining "net income of the taxpayer (computed without allowance for depletion)." Those sections are as follows:

"Art. 201. *Depletion of mines, oil and gas wells; depreciation of improvements.* — * * *

"(c) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface only as is reasonably expected to be underlaid with the mineral. The value of a mineral property is the combined value of its component parts.

"(d) A 'mineral deposit' refers to minerals only, such as the ores only in the case of a mine, to the oil only in the case of an oil well, * * *

"(e) 'Minerals' include ores of the metals, coal, oil, gas, and * * *

"(h) 'Depletion allowance in case of discovery': The deduction for depletion in case of the *discovery of a mine* shall not exceed 50 per cent of the net income, computed without allowance for depletion, from the property upon which the discovery is made, except that in no case shall the depletion allowance be less than it would be if computed without reference to *discovery* value. The phrase 'net income of the taxpayer (computed without allowance for depletion)' means the gross income from the sale of all mineral products from *the mining property* and any other income incidental to the operation of the property for the production of the mineral products, less the deductions in respect to the property upon which the *discovery is made,* including operating expenses, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion." (Italics our own.)

The respondent contends that "development expenses come within the same general class as the deductible items mentioned in the definition and as such should be included in the computation."

But even if it be conceded that development expenses do come within the same general class as the deductible items specified in paragraph (h), it is clear that such paragraph does not apply to oil wells. Not only are there specific references to "a mine" and to "the mining property," but the repeated provisions regarding "discovery value" clearly establish that paragraph (h) is applicable only to mines, and not to oil wells; for, as has already been shown, in the 1926 act, discovery value was abandoned with regard to oil wells.

Both "the history of the legislation" and "the administrative construction," therefore, compel the conclusion that, under the Revenue Act of 1926, in determining the "net income of the taxpayer (computed without allowance for depletion) from the property," for the purpose of applying the 50 per cent. limitation provided for in section 204 (c) (2), development expenses should not be deducted from gross income.

In U. S. v. Dakota-Montana Oil Co., supra, 288 U.S. 459, at page 466, 53 S.Ct. 435, 438, 77 L.Ed. 893, the court said:

"Thus the acts of 1918, 1921, and 1924 were consistently construed by the regulations to permit a depletion, but not a depreciation allowance for the costs of development work and drilling, which were treated for this purpose either as a part of the cost or an addition to the discovery value of the oil in the ground. The administrative construction must be deemed to have received legislative approval by the re-enactment of the statutory provision, without material change. [Cases cited.]"

The respondent argues that, since the paragraph in question provides that the allowance for depletion "shall not exceed 50 per centum of the net income of the taxpayer *(computed without allowance for depletion)* from the property," the rule of expressio unius est exclusio alterius should apply. In other words, the respondent contends that "the specific direction that depletion is to be excluded from the computation in determining net income precludes the exclusion of any other deductible item." As pointed out, however, in 25 R.C.L. 983: "The maxim is not of universal application, but is to be applied only as an aid in arriving at intention and not to defeat the apparent intention."

In specifically excluding the very element sought to be determined—namely, the

depletion allowance—Congress was merely giving effect to the axiom that a thing cannot be defined in terms of itself. In view of the legislative and administrative history that we have already traced, we do not think that the requirement that depletion shall not be deducted from gross income in determining net income from the property, implies a corresponding requirement that development expenses *shall* be deducted from gross income.

The respondent also asserts that "all the Regulations, beginning with those issued under the Revenue Act of 1928, have provided specifically that development expenses are to be deducted in arriving at the net income for the purpose of applying the limitation, and the provision limiting depletion to '50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property' has been re-enacted in the Revenue Acts of 1928, 1932, and 1934." From this, the respondent reasons that "the argument is compelling that the subsequent re-enactment of the same provision in the Revenue Acts of 1932 and 1934 constituted legislative approval of the Commissioner's Regulations issued under the Revenue Acts of 1928 and 1932."

A complete answer to this contention is to be found in the following language contained in the decision in Penn Mutual Life Insurance Company v. Lederer, 252 U.S. 523, 538, 40 S.Ct. 397, 402, 64 L.Ed. 698:

"But no aid could possibly be derived from the legislative history of another act passed nearly six years after the one in question. Further answer to the argument based on the legislative history of the later act would, therefore, be inappropriate."

Asserting that if the development expenses are not deducted from gross income in arriving at the 50 per cent. limitation, "the practical effect will be the allowance of a double deduction," the respondent cites Ilfeld Co. v. Hernandez, 292 U.S. 62, 68, 54 S.Ct. 596, 78 L.Ed. 1127, Burnet v. Aluminum Goods Mfg. Co., 287 U.S. 544, 551, 53 S.Ct. 227, 77 L.Ed. 484, and United States v. Ludey, 274 U.S. 295, 301, 47 S.Ct. 608, 71 L.Ed. 1054. The questions of fact and of law involved in those decisions, however, were altogether different from those presented here, and we do not think that those cases support the analogy that the respondent here seeks to draw. In the closing words of the decision in U. S. v. Dakota-Montana Oil Co., supra, 288 U.S. 459, at page 467, 53 S.Ct. 435, 438, 77 L.Ed. 893, the argument of the respondent seems not sufficiently to "consider the administrative and legislative history, which we think decisive."

Accordingly, in so far as it redetermines a deficiency in excess of $762.63, the decision of the Board is reversed.

DENMAN, Circuit Judge (concurring).

I cannot agree with Judge WILBUR'S contention that because both are "current expenses" in oil accounting, the phrase "operating expenses" used in article 201 (h), Regulations 69, under the Revenue Act of 1926 for taxing oil and gas income, is identical in meaning with the phrase "development expenses" in article 223 of the same Regulations concerning such income. Current expenses are divided into many items, and the difference between these two items is recognized by the Treasury Department. If two reasonable interpretations of the phrases are possible, that most favorable to the taxpayer must prevail. McFeeley v. Commissioner, 296 U.S. 102, 111, 56 S.Ct. 54, 80 L.Ed. ——.

Here the interpretation in favor of the taxpayer is not only a rational alternative, but is the interpretation acted upon by the Department itself for many years and up to the assessment of the taxpayer's deficiency, and is the interpretation supported by the report of the Senate Committee upon which the statute in question was enacted. For the reasons hereafter stated, I have reached the same conclusion as has Judge GARRECHT, that the decision below must be reversed.

The controlling factor here is that the term "net income of the taxpayer *from the property*" means operating income and is different from the taxpayer's general "net income" for final computation of its tax. The difference arises from the interpretation by both the Treasury Department and the Congress of the maximum depletion clause as based on *"operating profit,"* which excludes development items, whereas in computing the taxpayer's general net taxable income he may deduct *"development"* expense.

The pertinent portion of the clause determining the maximum depletion is the same in the 1921, 1924, and 1926 legislation.

The clause in the 1921 Revenue Act is as follows: "Shall not exceed the net income, computed without allowance for de-

pletion, from the property." Section 234 (a) (9).

In the 1924 Revenue Act it is as follows: "Shall not exceed 50 per centum of the net income (computed without allowance for depletion) from the property," and in the 1926 act: "Shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property." Section 204 (c).

Since in any case the "net income from the property" belongs to the taxpayer, no significance can attach to the insertion in the 1926 act of the words "of the taxpayer."

The change from a maximum limit of depletion of *all* the net income of the property in the 1921 act to 50 per cent. thereof in the 1924 and 1926 acts does not change the interpretation of the phrase "net income * * * (computed without allowance for depletion) from the property." Nor does the interpretation of the identical phrase change because it is the maximum deduction permitted in the 1921 and 1924 acts, where it limits a sum based on discovery value, and in 1926, where it limits a figure estimated on a flat percentage of gross income from the discovered wells. The function of the clause as a limiting formula is the same, though it limits a depletion based upon different figuring.

As later appears on the Commissioner's admission and the record here, we are entitled to infer he has interpreted the clause in the same way under the 1926 act as under the earlier acts in *every case except that of the Ambassador Petroleum Company.*

Under the 1921 and 1924 acts the regulations interpreting "net income from the property" are:

"(h) Net income is the gross income from the sale of all mineral products and any other income incidental to the operation of the property for the production of the mineral products, *less operating expenses,* including depreciation on equipment, and taxes, but excluding any allowance for depletion. * * * Operating expenses, depreciation, and taxes on the property upon which the discovery is made, should be applied against the gross income from the same property on the basis of actual expenditures." Revenue Act 1921, Regulations 62, Art. 201 (h).

"(h) The phrase 'net income (computed without allowance for depletion)' means the gross income from the sale of all mineral products and any other income incidental to the operation of the property for the production of the mineral products, *less operating expenses,* including depreciation on equipment and taxes, but excluding any allowance for depletion. * * * Operating expenses, depreciation, and taxes on the property upon which the discovery is made, should be applied against the gross income from the same property on the basis of actual expenditures." Revenue Act 1924, Regulations 65, Art. 201 (h).

It is a proper inference that such specific mention of "operating expenses" and omission of "development expense" was to be interpreted by the Department as meaning that the net income from the property meant net operating income. However, we are not required to rely on mere inference, for the Commissioner's brief, in an admission later quoted, states that the Department so actually computed and assessed all the petroleum taxation under these acts.

The 1924 act was passed pursuant to a Senate Finance Committee Report interpreting "net income from property" as "operating profit," as follows:

"The exception contained in subdivision (c) supersedes the second and third provisos of section 214 (a) (10) and 234 (a) (9) of the existing law. The existing law limits discovery depletion to the *operating profit* from the property upon which the discovery is made. The bill limits discovery depletion to 50 percent of the *operating profit* from the property upon which the discovery has been made."

Even in the absence of these Treasury Regulations and the Department's interpretation in its administration, the Congressional construction of the limiting clause "net income from the property" in the act of 1924, as based on net operating income, must control the interpretation of the identical clause re-enacted in the act of 1926.

The Treasury Regulations under the act of 1926 follows the Congressional interpretation of a maximum depletion based on *operating* income. It specifies the deductions expressly mentioning *operating* expenses and *omitting development* expenses It is as follows:

"Less the deductions in respect to the property upon which the discovery is made, including *operating expenses,* depreciation, taxes, losses sustained, etc., but excluding

481

any allowance for depletion." Revenue Act 1926, Regs. 69, Art. 201 (h).

This regulation was adopted on August 26, 1926. The Commissioner's brief admits that for over a year the Department followed the Congressional interpretation and computed the maximum depletion on an operating income basis "disregarding development expenses" in the computation.

"Prior to September 26, 1927, it had been the practice of the Commissioner to disregard development expenses in computing the 'net income from the property.'"

For all the record shows, the 1926 act has been so administered *to this date as to every other petroleum producer's return.* It appears there was a "General Counsel's Memorandum," of date September 26, 1927, answering a different question of the Commissioner (G.C.M. 2315, VI-2 C.B.21) in which his counsel volunteers the advice that under the 1926 act "development expenses" should be deducted in arriving at "net income from the property." But the Commissioner's brief frankly admits that such memorandum of advice from his counsel does not mean that it was in fact followed in any of the cases pending. Commissioner's brief at page 10 says:

"The Commissioner's interpretation was embodied in a General Counsel's Memorandum, which, together with I. T.'s and other informal rulings does not have the force or effect of Treasury Decisions and does not commit the Department to any interpretation of the law. See cautionary notice published in the Internal Revenue Bulletins; also Helvering v. New York Trust Co., 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361."

Helvering v. New York Trust Co. sustains the Commissioner's admission. It holds, 292 U.S. 455, at page 468, 54 S.Ct. 806, 810, 78 L.Ed. 1361:

"The rulings, I. T. 1379, 1660 and 1889, cited by the Commissioner were made before the passage of the 1924 act, but they 'have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law.' See cautionary notice published in the bulletins containing these rulings. It does not appear that the attention of Congress had been called to any such construction. There is no ground on which to infer that by the 1924 act Congress intended to approve it."

We thus see that upon the *Commissioner's admission and the record here* we must assume that from 1922 to today the Treasury Department has both by regulation and practice interpreted the maximum depletion phrase "net income from the property" in the 1921, 1924, and 1926 acts as net *operating* income just as Congress interpreted it for the 1924 act and that "development expenses" are not to be deducted.

The Commissioner now contends that the interpretation so made by him is open to two objections. One is that the phrase "computed without allowance for depletion" in the 1921, 1924, and 1926 acts is exclusive and that all expenses (other than depletion allowance) which may be deducted from the taxpayer's gross income must be subtracted in computing the maximum deduction, even though they are not operating expenses. "Expressio unius est exclusio alterius" is invoked.

The answer to this is that this principle was not applied to the phrase "computed without allowance for depletion" in the 1921 or 1924 regulations or by Congress in adopting the 1924 act pursuant to the Senate Report, that "the bill limits discovery depletion to 50 per cent. of the *operating profit* from the property upon which the discovery has been made."

All three interpret the maximum depletion to be the net operating income.

Appellee's second objection is that under such an interpretation the taxpayer can on the same return deduct his "development expenses" in determining the tax on his entire net income under Article 223 of Regulations 69 and not subtract it in determining the 50 per cent. net operating income maximum of his depletion allowance, and, hence, by this method obtain a reduction in his total net income of one and one half times his development expense.

The answer is that this is exactly what happened under the 1921 and 1924 acts. Both the Regulations for 1921 and 1924 and the Senate Report on which the 1924 act was passed (and the Regulations under the 1926 act claimed to be applicable) provided for a maximum depletion allowance based upon the deduction only of "operating expenses" to compute "operating profit." Identical Regulations on all three acts, 1921 Reg. 62, Art. 223; 1924 Reg. 65, Art. 225; 1926 Reg. 69, Art. 223, also allow the taxpayer the option to deduct development expenses from his gross income. Thus Congress passed the 1926 act after many years of administration under which the taxpayer had the one and one half deduction and Congressional approval in the Senate Re-

port on the bill which became the act of 1924.

Ilfeld Co. v. Hernandez, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127, is cited as supporting the Commissioner's contention that there cannot be more than one deduction for development expenses. On the contrary the holding in this case clearly supports the taxpayer. That case decides, 292 U.S. 62, at page 65, 54 S.Ct. 596, 597, 78 L.Ed. 1127, that exercising the option to make a consolidated return "constituted acceptance by petitioner and its subsidiaries of the regulations that had been prescribed."

The exercising of the option to treat development expense as a current deduction rather than a capital expense "constituted acceptance by the petitioner * * * of the regulations that had been prescribed." That is to say, the taxpayer here accepted the correlative petroleum regulations of the 1921, 1924 and 1926 acts treating the maximum depletion as based on net operating income.

The Congress in granting the option may well have had in mind its future taxation on the income from petroleum production. Not only is the election controlling for the year in question but under the Regulations for 1921 (223); 1924 (225), "An election once made under this option will control the taxpayer's returns for all subsequent years"; and a similar provision for 1926 (223), "An election once made under the provisions of this article will control the taxpayer's returns for all subsequent years." The Commissioner's brief points out that in these three successive tax acts the provisions were each time less favorable to such producers. Taxpayer to obtain the one and one half deduction must give up his option to have his development expenses added to his capital with its spread of depreciation or depletion deductions over later years.

The court takes judicial notice of the likelihood of exhaustion of the petroleum supply with its increased value to the taxpayer's producing wells. Taxpayer's extra half deduction for "development expenses" in 1925 may have well meant a gain to the government in future taxation of much more than this extra half, when higher prices for petroleum would make the depletion or depreciation a deduction from a higher flat percentage normal tax or in the higher brackets of a graduated tax and surtax income taxation or taxation on excess prof-its. Already we have an increase in flat percentage which increase this taxpayer must pay on his income without deduction of a capitalized development expense. We cannot be oblivious of the bills introduced in the Congress and the agitation for corporate surplus and excess profits taxation, under which the taxpayer's loss of his spread of development expense in capital depreciation or depletion will yield the collector much more than the extra one half deduction in 1925.

Commissioner's contention that the act of 1926 must be construed under a regulation of the act of 1928, that is to say, by the construction an act passed over two years after taxpayer's return and a regulation adopted over three years after, need scant attention. Such a different regulation under a subsequent act is not the regulation "accepted" by the taxpayer under Ilfeld Co. v. Hernandez, supra, when it exercised its option not to capitalize its development expense to lessen the taxation of subsequent years and take it as a present deduction.

As was said in Helvering v. New York Trust Co., supra, 292 U.S. 455, at page 468, 54 S.Ct. 806, 810, 78 L.Ed. 1361, when the 1928 act was passed, "It does not appear that the attention of Congress had been called to any such construction" as in the volunteered advice of the General Counsel in the bulletin of September, 1927. If it was called to its attention, the phrase "net income from the property" may take a different construction for taxation under its terms than the Senate Committee did when it construed it as net "operating profit." If the General Counsel's Memorandum or some similar interpretation was not the basis of the 1928 act, then it should be interpreted as it was for the same phrase in the 1924 act. Such proposals to interpret past legislation by construction of future enactments have been refused by the Supreme Court. Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 538, 40 S.Ct. 397, 64 L.Ed. 698.

The stipulation of facts here agrees on two items of the development expense, $10,-569.70 and $14,141.65. It is also agreed that the total depreciation item of $94,583.67 consists of $67,171.93 depreciation on development equipment and the balance on operating equipment. No business accountant in figuring "operating profit" the term used in the Senate Committee Report, would include in his deduction either development expenses or depreciation on development

(as distinguished from operating) equipment.

The regulations also contained a definition of operating profit as follows:

"(f) 'Operating profit' is the net amount received from mineral production before depletion and depreciation are deducted. It is distinct from net income as defined in section 212." Regs. 62, 65, 69, Art. 201 (f).

By this definition all depreciation is excluded. However, taxpayer claims only the exclusion of depreciation on development equipment. In view of our interpretation of article 201 (h) in connection with the Senate Report limiting discovery depletion to fifty per cent of "operating profit" and hence excluding development depreciation, it is unnecessary to consider whether under 201 (f) operating depreciation as well should be excluded from the computation.

The decision of the Board of Tax Appeals is reversed.

WILBUR, Circuit Judge (dissenting).

In the case at bar three items involved aggregating $91,832.28 have been claimed by the petitioner as its expenditures in the ordinary course of its business to be deducted from gross income in determining its net income, estimated without the depletion allowance. This deduction has been allowed. The law also authorizes a further deduction from the net income so determined of a depletion allowance, but provides that it shall not exceed one-half of the net "income from the property" estimated without the depletion allowance. The Commissioner has determined the "net income from the property" in the same way that he has determined the "net income of the taxpayer" (without depletion)," that is by deducting the operating expense claimed by the taxpayer which includes the so-called "development expense" to determine the net income from its property. The taxpayer contends that a current expense of the business of operating an oil company's oil property is not a true operating expense of operating such property where the expense of operation may be, but is not capitalized at the election of the taxpayer. To state the proposition in the language of the petitioner's brief, we quote as follows:

"The latter article (Arts. 223 and 201 [h] of Regs. 62) requires the deduction of 'operating expenses' in arriving at 'net income * * * from the property.' But 'development expenses,' which are of such a nature and character that they may properly be capitalized, as recognized in Art. 223, are, and since Regs. 62 always have been, regarded as different and distinct from true 'operating expenses,' which are of such a nature as not properly to permit of their being capitalized."

I find no difficulty in concurring with my brethren upon the subject of the deduction of operating expenses only in ascertaining the net income "from the property." I differ from them in the idea that the expenditures upon oil property have a fixed status as an operating expense on the one hand, or a development expense, a capital investment, on the other. In my opinion, it is in any case money out of pocket in the current year which may be treated as an expense, or a capital investment as the taxpayer elects, according to the rule of the Internal Revenue Department.

When he does elect, he should be held to his election. This is in accordance with the Treasury regulations (Reg. 69, art. 223) adopted in pursuance of the statute (Revenue Act 1926, § 234 (a) (8) requiring the Commissioner to adopt such rules for fixing "* * * a reasonable allowance for depletion." The regulations provide that "such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with the exploration of the property, drilling of wells, building of pipe lines, and development of the property may at the option of the taxpayer be deducted as a development expense or charged to capital account returnable through depletion. * * * An election once made under the provisions of this article will control the taxpayer's returns for all subsequent years." Treasury Regulations 69, adopted under the Revenue Act of 1926, art. 223. As the Supreme Court stated in U. S. v. Dakota-Montana Oil Co., 288 U.S. 459, 53 S.Ct. 435, 436, 77 L.Ed. 893, "Article 223 purports to permit the taxpayer to choose whether to deduct costs of development and drilling as a development expense in the year in which they occur or else to charge them 'to capital account returnable through depletion.'" Aside from the question of the effect of an election by the taxpayer to treat development expense as a current expense it is clear that the expense of drilling a well may be treated either as a capital investment, or as an expense, depending in part upon whether or not the income of the property is sufficient to justify the expenditure of that sum from the current income.

Whether or not a developing expense should be treated as a current or operating expense and as such deductible from current income in estimating the income tax or whether it should be treated as an investment of capital not deductible from current income, and when so considered, to be added to the capital, to be recovered by subsequent deductions from gross income by either a depreciation or a depletion allowance, is one which cannot be settled by the application of an arbitrary legal rule. It must depend upon the situation of the party and also upon his election as to whether he will treat the expenditure as an operative expense or as a capital investment as manifested by his bookkeeping system or by his return for income tax purposes. This is a factual question. It is somewhat analogous to the question of overhead expenses in the development of a public utility property. Many items of overhead may be treated as current expenditures on the one hand, or as a capital investment on the other. See discussion in my concurring opinion in the Los Angeles Gas & Electric Corp. v. Railroad Comm. (D.C.) 58 F.(2d) 256, 267, a rate case. See, also, the majority opinion by Judge James in that case, 58 F.(2d) 256, 260, 261. We there held that the public utility company should not be permitted to shift its ground and claim that amounts apportioned to current expense and thus paid by the consumers, should be subsequently treated as a capital investment upon which compensatory rates should be allowed to the company. This principle was recognized and apparently approved by the Supreme Court speaking through Chief Justice Hughes in that case, 289 U.S. 287, 293, 294, 309, 310, 311, 317, 53 S.Ct. 637, 77 L. Ed. 1180. See, also, discussion as to going concern value, 289 U.S. 316, 317, 53 S.Ct. 648, 77 L.Ed. 1180, and dissent of Justice Butler, 289 U.S. 323, 53 S.Ct. 650, 77 L.Ed. 1180.

In dealing with the question of the allowance for depletion of mineral properties in income tax matters, it should be remembered that the allowance for depletion is made as a deduction for capital returned by the sale of the minerals or oil recovered. That is to say, depletion is capital extracted from the property. This capital has been commingled with the income or profit derived from the property and must be deducted from the gross returns in ascertaining the profit or income from the property. See discussion in Murphy Oil Co. v. Burnet (C.C.A.) 55 F.(2d) 17; Id., 287 U.S. 299, 306, 53 S.Ct. 161, 77 L.Ed. 318. If, therefore, the taxpayer treats the development expense as a capital investment, his depletion allowance should be correspondingly increased (see U. S. v. Dakota-Montana Oil Co., supra) whereas if he treats the expenditure as an operating expense to be deducted from current income, it should not be also added to the capital investment and again recovered in the form of a depletion allowance deducted from gross income.

It should be observed here that under the statutory formulæ for ascertaining the depletion allowance, it is increased by treating the development expenditure as a capital investment, as it should be, because such capital must be recovered through the depletion allowance. On the other hand its deduction as an operating expense correspondingly decreased the depletion allowance which is given for the recovery of capital. It is true that in the arbitrary legislative formulæ the allowance of 27½ per cent. of the gross income from the property as a return of capital, allows no flexibility as to return of capital investment from the property, but the qualifying clause for fixing the depletion allowance now under consideration does respond in a measure to this principle of an allowance for return of capital as illustrated in the case at bar; for if the taxpayer treats the development expense as capital investment it at once receives a return by way of depletion allowance of about 50 per cent. thereof as a capital return, whereas if it treats it as a current expense or operating expense it gets it all as a deduction to be at once subtracted from his gross income and not as a depletion allowance. This is as it should be for having been returned to the taxpayer as an allowable deduction from the gross income it represents no investment of capital and consequently should not figure in the depletion allowance of that year or any other. If development expense is treated as a capital investment for the purpose of fixing the depletion allowance, it should be treated as a capital investment in determining the taxable net income, and vice versa. If treated as a capital investment, 50 per cent. is deducted at once in the form of a depletion allowance; if treated as a current expense, 100 per cent. is at once deducted, but in no event should the taxpayer have a 150 per cent. deduction. The taxpayer should not be permitted to blow hot and cold in the matter but should be held to his election.

The order should be affirmed.