## COUNTWAY et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3729.

Circuit Court of Appeals, First Circuit.

April 7, 1942.

70

Alfred P. Lowell, of Boston, Mass., for petitioners for review.

Michael H. Cardozo, IV, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Edward H. Hammond, Sp. Assts. to Atty. Gen., on the brief), for Commissioner.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Francis A. Countway, Arthur F. Bernhard, and William P. Jackson and wife petition for review of decisions of the Board of Tax Appeals redetermining, respectively, an income tax deficiency against Countway for the year 1933, against Bernhard, and against Jackson and wife, both for the year 1935. In each case the Commissioner's deficiency notice made several adjustments to net income, but the only adjustment challenged before the Board, and now in issue here, involved the question of the proper basis for determination of capital gain or loss on the sale of certain shares of corporate stock in the years for which the deficiencies were determined. The cases arose out of the same set of facts and were consolidated for hearing before the Board.

Each of the petitioners, on January 1, 1930, and for some years prior thereto, was an officer of Lever Bros. Company, a Maine corporation having its principal place of business in Cambridge, Massachusetts. All of the stock of this company was owned by Lever Bros. Ltd., an English company. The £2,400,000 of ordinary shares of Lever Bros. Ltd. were from some date prior to May 1, 1909, down to the date of his death in 1925 all owned by Sir William Hesketh Lever, later made the first Viscount Leverhulme. In addition to the ordinary shares, Lever Bros. Ltd. had outstanding in 1929 and 1930 six classes of preference shares of an aggregate par value of £54,227,546. Shareholders were entitled to one vote for every £10 capital of any class held by them.

In 1909 Sir William Hesketh Lever devised an elaborate profit-sharing scheme for the benefit of officers and employees of Lever Bros. Ltd. and of its affiliated companies, among which was Lever Bros. Company, the Maine corporation above mentioned. In order to carry said scheme into effect he established a trust, and caused the articles of association of Lever Bros. Ltd. to be appropriately amended so as to provide that out of the moneys which otherwise would be payable in dividends on the ordinary shares of Lever Bros. Ltd., certain amounts, computed in accordance with detailed provisions inserted in the articles, should be paid to the trustees of the said trust.

Concurrently with the making of the aforesaid amendments to the articles of association the trust was established by an indenture dated May 1, 1909, between Sir William Hesketh Lever, party of the first part, Lever Bros. Ltd., party of the second part, and five individuals, directors of Lever Bros. Ltd., named as trustees of the trust, parties of the third part. The indenture provided for the issuance by the trustees to officers and employees of Lever Bros. Ltd. and its affiliated companies of so-called "partnership certificates" having a nominal value expressed in pounds, the amount to be issued from time to time to any particular officer or employee to be dependent upon length of service, salary and merit, as determined by the trustees. Provision was made for the distribution to the holders of such partnership certificates pro rata in accordance with the nominal value thereof of the amounts received by the trustees from Lever Bros. Ltd. pursuant to the provisions of the amended articles of association.

The amounts payable to the trustees "as provided in the Articles of Association of the company for the time being" constituted the sole asset of the trust.

The "partnership certificates" were nontransferable. It was stipulated that "such certificates had neither capital value nor market value at any time." Certificates held by any employee were subject to cancellation by the trustees in case they should find the employee to be "guilty of neglect of duty, dishonesty, intemperance, immorality, willful misconduct, flagrant inefficiency, disloyalty to his employers, or breach of his undertaking not to waste time, labour, materials or money in the discharge of his duties, but to loyally and faithfully further the interests of the company and its Associated Companies to the best of his skill and ability." If the employee voluntarily resigned or retired before reaching 65, his certificates were to be cancelled. If any act or event should happen during the life of the employee "whereby the Partnership Certificates held by him under the Scheme, if belonging absolutely to him, would become vested in or charged in favour of some other person or a corporation", cancellation of his certificates would automatically occur. Upon retirement of an employee after reaching 65, certain limited non-transferable benefits were continued in his favor. Also, upon the death of an employee certain limited benefits were continued in favor of his widow during her widowhood.

In clause 4 of the indenture it was provided:

"The rights (including the right to dividend) attached to any Partnership Certificates may from time to time be altered by the Trustees with the consent of the Holder of the Majority Shares of the Company,[1] but no alteration in the rights of the existing Certificate Holders in respect of Partnership Certificates previously issued shall, except as herein provided, be made without the consent of such Holders."

[1] This phrase is defined in the indenture as meaning "the person or persons who for the time being is or are the registered holder or holders of all the issued ordinary shares of the Company or such holder of ordinary shares as shall be nominated in writing from time to time by the holder or holders of at least

Further, clause 13 provided:

"It shall be lawful for the Trustees at any time or times hereafter with the consent of the Holder of the Majority Shares of the Company, * * * and with the consent of the Holders of Partnership Certificates for a nominal amount of not less than three-fourths of the total nominal amount of the Partnership Certificates for the time being outstanding * * * by any deed or deeds revocable or irrevocable to revoke wholly or partially the trusts, powers, and provisions herein contained, and to declare such new or other trusts concerning the property, investments, and funds subject to the trusts hereof as the Trustees, with such consents, shall think fit, and it is hereby declared that the Scheme may at any time or times hereafter be altered or modified by the Trustees with such consents as aforesaid."

The petitioners were never in the employ of Lever Bros. Ltd., but as officers of Lever Bros. Company, the subsidiary Maine corporation, they were entitled to receive and did receive from time to time partnership certificates issued by the trustees.

Upon his death in 1925 Viscount Leverhulme bequeathed half of the ordinary shares of Lever Bros. Ltd. outright to his son and the other half to his executors, in trust for purposes not now material.

In 1929 there existed a Dutch company named N. V. Margarine Unie, which was closely affiliated with an English company named Margarine Union, Ltd. Between these two companies there existed a so-called equalization agreement by which provision was made for the equalization of dividends and of capital value on liquidation of the corresponding class of shares of the two companies.

Viscount Leverhulme, the son, and the executors of his father entered into negotiations in 1929 with Margarine Union, Ltd., for the exchange of all the ordinary shares of Lever Bros. Ltd. for shares of Margarine Union, Ltd. As a part of this transaction Viscount Leverhulme and the executors agreed to put an end to the above described payments by Lever Bros. Ltd. to the trustees for distribution to the holders of the partnership certificates, payments which, but for the provisions of the trust

indenture, would have been available for dividends on the ordinary shares of Lever Bros. Ltd.

In order to carry out this agreement, Viscount Leverhulme and the executors engaged an independent actuary to make an actuarial valuation of the assumed dividend expectancy represented by the outstanding partnership certificates. The detailed method of this valuation is not disclosed in the record but it appears that each certificate holder's interest had to be separately valued because of individual factors such as age and length of service which had to be taken into account in each case. The contract between Viscount Leverhulme and the executors and Margarine Union, Ltd., provided for the issuance to the Viscount and the executors of ordinary shares of Margarine Union, Ltd. plus an amount in preference shares of that company substantially equal to the aggregate actuarial valuation of the outstanding copartnership certificates. The exchange of the ordinary shares of Lever Bros. Ltd. for ordinary shares and preference shares of Margarine Union, Ltd., was consummated as of January 1, 1930. Lever Bros. Ltd. remained in existence and no part of the outstanding preference shares of that company was acquired by Margarine Union, Ltd. Margarine Union, Ltd., at the same time changed its name to Unilever, Ltd. and its Dutch affiliate N. V. Margarine Unie changed its name to N. V. Unilever.

To take care of certain employees, holders of partnership certificates, including the three petitioners, who were not subject to the British income tax, and to avoid subjecting them to the withholding tax provisions, Viscount Leverhulme and the executors exchanged a number of preference shares of the English company (Unilever, Ltd.) for an equal par value of 7% preference shares of the Dutch company (N. V. Unilever).

Having made this arrangement, Viscount Leverhulme and the executors caused a notice to be sent on January 1, 1930, to the petitioners and other partnership certificate holders, advising them that they would now be enabled to turn their partnership certificates, which had no capital value, into an investment which had a capital value, viz., 7% cumulative preference shares of N. V. Unilever, and offering to each of the

___

three-fourths of the then issued ordinary shares to exercise the powers conferred upon the Holder of the Majority Shares of the Company by the Trust Deed and the Scheme."

partnership certificate holders the amount in value of such shares corresponding to the said actuarial valuation of his partnership certificates, in exchange for such certificates, which would then be cancelled. The petitioners accepted this offer and on April 21, 1930, each received the shares allotted to him under the above described arrangement. The shares became the property of the petitioners as of January 1, 1930.

Lever Bros. Company, the petitioners' employer, for the benefit of such of its employees as were partnership certificate holders under the trust, obtained in 1930 the opinion of its general counsel on the status of the Unilever preference shares in the hands of the former partnership certificate holders. He advised that the said shares were gifts to the employees from Viscount Leverhulme and the executors.[2] On the strength of this opinion Lever Bros. Company in a memorandum advised the petitioners and others similarly situated that they need not report the receipt of the Unilever preference shares on their tax returns for the year 1930. They were instructed, however, that upon any subsequent sale of these preference shares their basis for the determination of capital gain or loss would be the market value of the shares as of January 1, 1930.

Petitioners in good faith made their federal income tax returns for 1930, and for the years for which the deficiencies are asserted, in reliance on said opinion. The N. V. Unilever preference shares were not included at any value in income reported for the year 1930, nor was the receipt of said shares mentioned in the returns filed by the petitioners for that year. The statutory period of limitation for making any assessment of deficiencies in income tax against any of the petitioners for the year 1930 has expired.

In the year 1933 petitioner Countway sold his block of N. V. Unilever preference shares for the sum of $62,726.44. In his income tax return for that year he reported no gain or loss in connection with the said sale. But upon audit of his return the revenue agent allowed him a capital loss in the sum of $6,363.16, being the difference between the amount received for the shares and $69,089.60, the basis claimed therefor by the taxpayer.[3] The Commissioner, however, ruled that the entire proceeds of the sale, $62,726.44, should be counted as a capital gain.

The particulars in the cases of Bernhard and Jackson need not be set forth since they do not differ from the facts in Countway's case in any detail now relevant.

The Board has upheld the Commissioner's conclusion that the whole of the proceeds of the sale by Countway in 1933, $62,726.44, is taxable to him as income for that year.

We think the evidence amply warranted the Board's finding that petitioners "did not acquire the N. V. Unilever preference shares in 1930 as gifts, but acquired them as property received in exchange for the so-called partnership certificates." Undoubtedly these certificates in petitioners' hands gave them certain conditional legal rights to share in future profits of Lever Bros. Ltd. These rights of the certificate holders under the trust indenture could not be varied nor cancelled without the consent of the trustees and of the holders of "three-fourths of the total nominal amount of the Partnership Certificates for the time being outstanding" (clause 13 of the indenture; and cf. clause 4, both above quoted). Petitioners contend, however, "that the only right which the Trustees— and through them the certificate holders— had was the right as expressed in paragraph VII of the Trust Indenture * * *

---

[2] This opinion of counsel was based upon the theory that the partnership certificates and such benefits as came to the holders of them were in reality gifts from the late Viscount Leverhulme, and that the present Viscount Leverhulme and the executors, in order to carry out such intended benefactions, transferred their own property to certain individuals, not in satisfaction of any obligation nor in the expectancy of receiving anything in return, but because freely and out of hand they wished to confer certain benefits on those individuals.

[3] Consistently adhering to the theory that the preference shares were received by him in 1930 as a gift, the petitioner claimed that he took over the basis of his donors, § 113(a) (2), Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 514. Since the putative donors, Viscount Leverhulme and the executors, had received the shares as of January 1, 1930, in exchange for shares of equivalent value, it was claimed that the donors' basis was the value of the Unilever preference shares as of that date.

to have the company pay the sums 'provided in the Articles of Association of the company for the time being'"; and hence that Lever Bros. Ltd., by a mere amendment of its articles could, without the consent of the certificate holders, eliminate their substantial right to share in the corporate profits. But the courts would naturally be reluctant to adopt any such vitiating interpretation, in view of paragraphs 4 and 13 of the trust indenture, to which Lever Bros. Ltd. was itself a party. Furthermore, the exchange in 1930 was not between Lever Bros. Ltd. and the partnership certificate holders but between Viscount Leverhulme and the executors on the one hand and the certificate holders on the other. Viscount Leverhulme and the executors were, so far as appears, only the owners of the ordinary·shares of Lever Bros. Ltd. There was outstanding a much larger amount of preference shares, which had equal voting rights; so ·even if Lever Bros. Ltd. had power to destroy the rights of the certificate holders by amendment of the articles of association, it does not appear that Viscount Leverhulme and the executors had such power in their own hands. Certainly they never asserted any such power; rather, in their correspondence with the certificate holders, they made what was in terms an *offer* to deliver an equivalent amount of N. V. Unilever preference shares in exchange for the surrender up for cancellation of the partnership certificates. The negotiations proceeded on the basis that the certificate holders had something which the offerors were prepared to pay for, namely, certain rights which constituted a charge on earnings otherwise available as dividends on the ordinary shares of Lever Bros. Ltd. Even if the rights of the certificate holders were of doubtful legal worth, the surrender up of such rights was good consideration for the proposed delivery of N. V. Unilever preference shares in exchange. It cannot be said that the Board erred in interpreting the transaction as the parties themselves treated it—as an exchange rather than a gift. On that basis, we proceed to examine the tax consequences.

■ The receipt by petitioners of their partnership certificates prior to 1930 did *not* constitute taxable income. According to the stipulation: "The parties agree that the petitioners correctly omitted from gross income reported for the years in which the partnership certificates were received any value with respect thereto." Had they received a bonus of corporate stock as additional compensation for their services, the value of the stock upon receipt would have been taxable as income in the year received (cf. Bogardus v. Commissioner, 1937, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32); and this value would have become the basis of the stock in their hands, since it would be presumed that they had rendered in exchange services of equivalent worth. But the partnership certificates were quite different from corporate stock. They were non-transferable, had no capital or market value, and merely constituted assurances to the employees of their right to share in future profits upon condition of continuing to render faithful and satisfactory services. In no fair sense could it be said that upon receipt of the partnership certificates the employees thereupon realized a gain in the amount of what might then have been the actuarial valuation of the assumed dividend expectancy. Since the certificates upon receipt did not have a capital value like corporate stock, and since any concrete benefit therefrom to the employees by way of future dividends thereon depended upon the rendition of future services, not past services, the certificates came into the hands of the employees upon a cost basis of zero.

Therefore, when as of January 1, 1930, petitioners exchanged these partnership certificates (with a basis of zero) for the N. V. Unilever preference shares, they made a taxable gain equal to the market value of the preference shares on that date. This gain should have been reported in the tax returns for 1930.

What, then, became the basis of the preference shares in petitioners' hands? Following is the Board's analysis:

"We have already pointed out that the exchange which took place in 1930 was not one excepted from the recognition of gain or loss under section 112 of the Revenue Act of 1928 [26 U.S.C.A. Int.Rev. Acts, page 377]. Therefore, the cost to petitioners of the stock which they acquired in 1930 was the value of the property which they gave up in exchange for it. If we had no evidence as to what the value of the property given in exchange was, then the presumption would be that it had a value equal to the fair market value of the shares of stock which were received in exchange for it. Ambassador Petroleum Co. [v. Commissioner], 28 B.

T.A. 868, reversed on another point [9 Cir.], 81 F.2d 474; Holmby Corporation [v. Commissioner], 28 B.T.A. 1092, affirmed [9 Cir.], 83 F.2d 548, and cases there cited.

"But the rule cited in the foregoing cases does not apply in the instant case because we do have evidence as to the value of the property which petitioners gave in exchange for the shares of stock which they received. It has been stipulated that the partnership certificates 'had neither capital value nor market value at any time.' In view of this stipulation, we think we must hold that the N. V. Unilever preference shares of stock which petitioners received in 1930 had no cost basis to them."

█ We think the Board misapprehended the meaning of these stipulated facts. The rights of the certificate holders being wholly non-transferable, it is correct to say that they had no "market value". Being merely evidence of a right to receive future income payments (like a profit-sharing employment contract), it is correct to say they had no "capital value", in contradistinction to a bond or stock certificate. But this does not mean that they were in every sense valueless. Indeed, the other stipulated facts belie any such conclusion. It happened that the certificates came to have a very particular value in the eyes of Viscount Leverhulme and the executors. They wanted to transfer to Margarine Union, Ltd. their ordinary shares in Lever Bros. Ltd., and Margarine Union, Ltd., was unwilling to make the proposed exchange unless Viscount Leverhulme and the executors procured an extinguishment of the rights of the certificate holders to share in the surplus profits of Lever Bros. Ltd. which otherwise would have gone to augment the dividends on such ordinary shares. Hence Viscount Leverhulme and the executors were willing to pay petitioners for the surrender up of their partnership certificates by transferring to petitioners an amount of N. V. Unilever preference shares equivalent in value as of January 1, 1930, to the then commuted value of the anticipated future dividends receivable under such partnership certificates, as determined by an independent actuary. This "actuarial value", which was determined to be the worth of the partnership certificates in the peculiar circumstances, became the "cost" of the N. V. Unilever preference shares

which petitioners received in exchange. Thus, the basis of the preference shares in Countway's hands was $69,089.60, an amount equivalent to the market value of such shares as of January 1, 1930. When the shares were sold in 1933 for $62,726.-44, Countway suffered a capital loss of $6,363.16.

The Board's argument, above quoted, for the conclusion that the basis of the preference shares was zero seems to be inconsistent with the statement following immediately thereafter in its opinion: "The situation would, of course, be different if they had taken the fair market value of the stock into income in 1930 and had paid tax thereon. In that event, the cost basis of their stock in the years when they sold it would have been the fair market value of the stock which they took into income in 1930." What the preference shares "cost" the petitioners depends on the value of the partnership certificates which were exchanged for them, and this value is neither more nor less by reason of how petitioners treated the transaction in their returns for 1930. If the stipulation really meant that the partnership certificates had no real value of any sort at any time, then the cost basis of the preference shares would necessarily have been zero, even had petitioners reported the receipt of the preference shares as constituting income in 1930 to the full market value thereof. This would have led to the result of a double tax on the same gain, once in 1930 and again in 1933, the absurdity of which serves to emphasize the correctness of our conclusion that though the partnership certificates had a cost basis of zero they nevertheless had a value in 1930 equal to the value of the preference shares then exchanged for them.

Therefore, unless Countway is estopped from showing the true situation, he suffered a capital loss of $6,363.16 upon the sale in 1933 instead of making a capital gain of $62,726.44 as ruled by the Commissioner and by the Board. The Commissioner has urged the defense of estoppel before the Board and before this court. His argument is: "The taxpayer cannot use the value of the N. V. Unilever shares when received as cost because they failed to report the receipt thereof as income in the year in which the shares were received. The failure, however innocent, to report this income constituted, in effect, a statement that no such income was re-

ceived and the government, in reliance thereon, failed to receive the amount of any such tax as might have resulted if the taxpayers' return had been accurate. Having made such a misrepresentation the taxpayer ought not now to be permitted to have the benefit thereof at the expense of the government."

■ Our decision in Crane v. Commissioner, 1 Cir., 1934, 68 F.2d 640, is the main reliance of the Commissioner. There the taxpayer, the owner of a lot with building thereon, leased it in January, 1920, for a term of ten years and, in accordance with the terms of the lease, the lessee in 1920 made improvements, in the amount of $95,182, which were to revert to the lessor upon termination of the lease. According to the law as it then stood, when the taxpayer made his return for 1920 income he was under an obligation to return and pay a tax on the depreciated value of such improvements, as part of his income for that taxable year. However, he failed to report such income. In 1927 the taxpayer sold the land and building subject to the lease. In computing gain or loss upon the sale of the property, the taxpayer added to his cost basis the depreciated value of the improvements. We upheld the Commissioner and the Board in their ruling that the gain or loss must be recomputed without making any allowance for such depreciated value of improvements. Where one is under a duty to disclose the existence of a fact, his non-disclosure of the fact is equivalent in legal effect to an affirmative statement that the fact does not exist. Cf. Am.L.Inst. Restatement of Torts, § 551; Restatement of Contracts, § 472; Restatement of Restitution, § 8, comment b. Since, therefore, the taxpayer in the Crane case had in effect represented that no improvements had been made in 1920, the statute of limitations having meanwhile run on a deficiency assessment for that year, the taxpayer was estopped from asserting in 1927 that such improvements had in fact been made and that the depreciated value thereof should be added to his basis. Estoppel may be founded upon an innocent misrepresentation as well as upon a consciously false statement.

In the Second Circuit our reasoning in the Crane case has been questioned. Salvage v. Commissioner, 1935, 76 F.2d 112, 114, affirmed on certiorari 1936, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511; Commissioner v. Union Pacific R. R. Co., 1936, 86 F.2d 637, 640; Helvering v. Schine Chain Theatres, Inc., 1941, 121 F.2d 948, 950. And see Schmidlapp v. Commissioner, 1938, 96 F.2d 680, 683, 118 A.L.R. 297. Their view is that an estoppel cannot be founded upon silence due to an error of law. Nevertheless, we think our decision in the Crane case was right, on the facts there disclosed. But we do not think the case controls the case at bar.

■ Of course the mere fact that the statute of limitations bars the government from collecting a deficiency in an earlier year does not justify the Commissioner in distorting the income for a later year in order indirectly to rectify the previous error. See Commissioner v. Saltonstall, 1 Cir., 1941, 124 F.2d 110. The petitioners were under a duty, as we have seen, to report the taxable exchange in their returns for 1930. Their failure to do so might, according to the reasoning of the Crane case, amount to a representation that no such exchange took place. This, however, does not help out the government's case, because the petitioners are quite content to be held now to the same position they took in 1930, namely, that the transaction in that year was not an exchange but was a gift. As the petitioners rightly observe: "If the Commissioner were now asserting that the transaction was a gift, the petitioners might be estopped to deny the truth of that assertion; but when he says it was not a gift, then the petitioners are not estopped to prove what their statutory basis is on the theory asserted by the Commissioner." It would be an unwarranted extension of the Crane case to torture the good-faith non-reporting of the taxable exchange in the return for 1930 into a representation that the partnership certificates were worth zero at the time they were exchanged for the N. V. Unilever preference shares, and that therefore the cost basis of such shares in petitioners' hands was zero. We think the petitioners are not estopped from showing the true situation. See Commissioner v. Saltonstall, supra. Of course, if the Second Circuit is right in the cases cited above, there is even more clearly no estoppel here.

The decisions of the Board of Tax Appeals are vacated and the cases are remanded to the Board for recomputation of the deficiencies in conformity with this opinion.